UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DELINA D. CALHOUN,          )
                          )
           Plaintiff,      )
                          )
       v.               )     Case No. 1:22-cv-00144-CCR
                          )
UNITED STATES OF AMERICA,    )
                          )
           Defendant.   )

**OPINION AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 27)

Plaintiff, Delina D. Calhoun, brings this action against Defendant, the United States of America, pursuant to the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. § 1346, for injuries allegedly sustained because of an accident involving a motor vehicle owned and operated by the United States Postal Service (the "USPS") on March 13, 2021. She alleges Defendant is liable for the USPS driver's negligence under New York law.

Pending before the court is Defendant's January 29, 2024 motion for summary judgment, arguing that Plaintiff has failed to establish causation and that New York's Comprehensive Motor Vehicle Insurance Reparations Act (the "No-Fault Law"), N.Y. Ins. Law. § 5101, bars her from recovering non-economic and pecuniary damages. (Doc. 27.) On March 25, 2024, Plaintiff opposed the motion, (Doc. 32), and Defendant replied on April 15, 2024, (Docs. 35, 36, 37), at which point the court took the pending motion under advisement.

Plaintiff is represented by Aaron Morris Adoff, Esq., and Todd M. Schiffmacher, Esq. Defendant is represented by Assistant United States Attorneys Mary K. Roach and Michael S. Cerrone.

**I.    Whether the Court Should Deem Defendant's Statement of Undisputed Material Facts Admitted.**

Plaintiff does not dispute Defendant's Statement of Material Facts Not in Dispute ("Defendant's Statement"),[1] and Defendant asks the court to deem its Statement admitted because Plaintiff has failed to properly controvert them by providing "qualified and/or non-responsive" answers, (Doc. 35 at 3), by asserting improper legal arguments, and by failing to cite evidence that demonstrates a genuine dispute.

Under Fed. R. Civ. P. 56(c)(1), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" with citations to the record. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Declarations that are not based on personal knowledge or that contain inadmissible hearsay or conclusory statements do not "create a genuine issue for trial." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

Pursuant to Western District of New York Local Rule 56, a party moving for summary judgment must file "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried[,]" that includes "citation to admissible evidence or to evidence

---

[1] Plaintiff requests to strike documents cited by Defendant "discussing or concerning Plaintiff's [unrelated medical condition.]" *See, e.g.*, Doc. 32-1 at 34, ¶ 134. Defendant acknowledges it inadvertently referenced this condition in its Statement of Material Facts Not in Dispute, but that reference has since been redacted. (Doc. 35 at 4 n.8.) To the extent any references to Plaintiff's unrelated medical condition remain, the court directs both parties to submit redacted documents removing such references.

that can be presented in admissible form at trial[.]" Loc. R. Civ. P. 56(a)(1). "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Loc. R. Civ. P. 56(a)(2).

As a threshold matter, Plaintiff argues that Defendant's Statement is deficient because "Defendant has failed to submit copies of the cited documents in the record supporting their allegedly undisputed facts." (Doc. 32-1 at 4.) Local Rule 56(a)(1) requires a party's statement of undisputed material facts to "be followed by citation to admissible evidence or to evidence that can be presented in admissible form at trial[.]" The Rule further provides that "[a]ll cited evidence . . . that has not otherwise been filed in conjunction with the motion shall be filed as an appendix to the statement" required by Local Rule 56(a)(1). Loc. R. Civ. P. 56(a)(3). Defendant's Statement complies with the Local Rules.

Plaintiff admits to certain facts and responds to other facts by asserting they "substantially summarize[] the contents of the record referenced therein[,]" *see, e.g.*, Doc. 32-1 at 19, ¶ 68, or that they are "generally consistent" with referenced testimony. *See, e.g., id.* at 10, ¶ 25. These facts are deemed admitted.

Plaintiff "objects" to other facts but fails to cite to evidence or declines to respond on the ground that the facts are based on "unredacted records discussing or concerning Plaintiff's [unrelated medical condition]." *See, e.g., id* at 34, ¶ 134. These facts are therefore also deemed admitted under Rule 56 and the Local Rules.

In other instances, Plaintiff "objects" to certain facts on the ground that they are "hearsay within hearsay statements[.]" *See, e.g., id.* at 39, ¶ 148. She cites no evidence to support a claim that the facts are inaccurate. *See Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 465 n.9 (S.D.N.Y. 2011) ("A hearsay objection does not suffice as a denial of a statement of undisputed fact.") (citing *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3*, 2006 WL 2136249, at \*4 (S.D.N.Y. Aug. 1, 2006) (finding plaintiffs' tactic of "disput[ing] the factual assertions in the defendants'

3

corresponding paragraphs with objections alone[,]" without providing "any authority for this method of contesting a moving party's Local Rule 56.1 statement," fails to create a genuine issue of material fact)). Statements challenged on this basis are therefore also deemed admitted. Loc. R. Civ. P. 56.1.

Plaintiff argues that paragraphs discussing her prior drug use and criminal history are inadmissible because they are "neither material nor relevant to any issue in this matter," (Doc. 32-1 at 33, ¶ 129), and requests these paragraphs be stricken from the record. Federal Rule of Evidence 609 governs the admissibility of a criminal conviction for impeachment purposes and provides that "for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence[] must be admitted, subject to Rule 403, in a civil case[.]" Fed. R. Evid. 609(a)(1)(A). "Where more than ten years have passed from the date of conviction or release from confinement for such conviction, whichever is later, evidence of the conviction is admissible only if its probative value substantially outweighs its prejudicial effect[.]" *White v. CSX Transp., Inc.*, 2024 WL 3228158, at *2 (W.D.N.Y. June 28, 2024).

Defendant's references to Plaintiff's criminal history do not establish whether any conviction was punishable by a period of imprisonment greater than one year and do not establish any relevance to the pending motion. Plaintiff's prior drug use also has no relevance to the pending motion. This evidence is both inflammatory and unfairly prejudicial. As a result, Plaintiff's criminal history and prior drug use are inadmissible under Fed. R. Evid. 403 and the court strikes paragraphs 128-133, 148, and 150 of Defendant's Statement from the record.

In support of her Opposition, Plaintiff includes a Counterstatement of Material Facts ("Plaintiff's Counterstatement"). A nonmoving party may include "additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried." Loc. R. Civ. P. 56(a)(2). In response, Defendant admits to several statements of fact but denies that all of Plaintiff's expert's "opinions have been stated to a reasonable degree of medical certainty." (Doc.

4

32-1 at 1, ¶ 1.) Defendant also denies Plaintiff "presented to the Emergency Department at the Erie County Medical Center seeking treatment for neck and back injuries she sustained as a result of a motor vehicle accident which occurred on March 13, 2021[,]" *id.* at ¶ 2, citing to the expert witness affirmations included in the appendix accompanying its motion as grounds for finding no causation.

## II.    Undisputed Facts.

### A.    Plaintiff's Preexisting Conditions.

Plaintiff was born with epilepsy and has experienced seizures that have caused frequent falls due to weakness and pain in both sides of Plaintiff's extremities. Since 2012, Plaintiff has suffered from a variety of illnesses including sarcoidosis of her organs, cryptococcal meningitis, pneumocystis pneumonia, and asthma. Plaintiff has had chronic back pain since at least July 1, 2013. She has experienced paresthesia in her left extremities since July 13, 2012. As of at least June 28, 2017, Plaintiff has complained of and been treated for chronic generalized pain, and before 2021, she was diagnosed with mononeuropathy of both upper extremities and fibromyalgia.

To manage her illnesses and symptoms, Plaintiff is prescribed a variety of medications, including Keppra, gabapentin, Norco/Lortab, baclofen, Lyrica, and medical marijuana. She uses a walker as needed. Plaintiff began physical therapy on September 10, 2020, attending eleven sessions through November 5, 2020. On December 28, 2020, she was terminated for lack of compliance with the attendance policy.

Due to complaints of back and neck pain and extremity discomfort and weakness, Plaintiff has undergone multiple MRIs of her cervical and lumbar spines. A December 21, 2018 cervical MRI concluded:

CONCLUSION: Abnormal MRI scan of the cervical spine without contrast demonstrating the following:

1.      Multilevel small disc spondylitic spur complexes of the cervical vertebral column. For the most part these do not compromise the neural foramina[] in any meaningful way. At C5-6 there is a slightly more conspicuous disc protrusion posteriorly, indenting the thecal sac and abutting the ventral aspect of the cord, also

5

causing minimal right and mild left neural foraminal narrowing.

2.    The cervical vertebral canal is congenitally narrow, and the above disc changes also contribute to further segmental narrowing. There is no spinal cord compression[,] however. No lesions are noted in the parenchyma of the cervical and upper thoracic spinal cord.

(Doc. 27-2 at 30, ¶ 195.)

A February 8, 2019 lumbar MRI revealed "small posterior disc bulges at the L3-4, L4-5[,] and L5-S1 levels." *Id.* at 31, ¶ 202. A March 12, 2021 cervical MRI showed "multilevel degenerative changes[,]" "posterior disc protrusion which also has a more prominent left paracentral herniation component[,]" and a "small annular tear indenting the thecal sac, [and] minimal right and mild left neural foraminal narrowing." *Id.* at 41-42, ¶ 287. That same day, Plaintiff underwent a lumbar MRI, which was "[m]ildly abnormal" and revealed "small posterior disc bulges . . . which cause minimal to mild neural foraminal encroachment." *Id.* at 42, ¶ 288. These imaging results led to "talk of surgery." *Id.* at 12, ¶ 82.

Since at least January 24, 2019, Plaintiff has relied on a home health aide who "assist[s] her with activities of daily living." *Id.* at 31, ¶¶ 201, 203. Plaintiff's daughter, Trisha Calhoun, has been Plaintiff's aide as of January 2021, providing services such as cleaning, "mopping, cleaning the tub, heavy laundry[,] and cooking meals." (Doc. 27-2 at 43, ¶ 292.) Ms. Calhoun also runs errands for Plaintiff, transports her in her vehicle, and occasionally helps her get dressed.

Ms. Calhoun describes Plaintiff as a "homebody" who spends most of her time at home watching television, playing games on her phone, and sleeping. *Id.* at 46, ¶ 311 (internal quotation marks omitted). Plaintiff and Ms. Calhoun grocery shop together, and although Plaintiff used to enjoy bowling and skating, she has not engaged in these activities since 2019. Plaintiff's treating physician has instructed Plaintiff not to drive long distances, and she has refrained from doing so because of her epilepsy.

In 2017 or 2018, Plaintiff was involved in a motor vehicle accident where she "was a front seat passenger in a vehicle which was rammed by a truck." (Doc. 32-1 at 61,

6

¶ 236).

**B.    The January 2021 Accident.**

On January 11, 2021, Plaintiff was involved in a vehicular "hit and run" in the City of Buffalo, New York (the "January 11 accident"). (Doc. 27-2at 32, ¶ 210) (internal quotation marks omitted). At the time, Plaintiff was a back seat passenger in a vehicle driven by Sheronda Maclin (the "Maclin vehicle"). As the Maclin vehicle was driving, a vehicle attempted to pass the Maclin vehicle on the right side, causing a collision. The second vehicle hit the Maclin vehicle at least four times on the side where Plaintiff was sitting. Plaintiff removed her seatbelt after the second impact, moved to the driver's side passenger seat, and buckled her seatbelt. During the impacts, Plaintiff's body did not come into contact with the interior of the Maclin vehicle, but her body was shaken. After the collision, Plaintiff complained of a sore neck due to whiplash, but she did not go to the Emergency Department ("ED") that day.

On January 12, 2021, Plaintiff was taken from her home to the Buffalo General Hospital by ambulance. She complained to ambulance personnel of neck and back pain radiating to her ribs and upper left chest. Once she arrived at the ED, Plaintiff underwent a lumbar CAT scan, which revealed minor lumbar degenerative disease. "She recalled screaming in pain whenever someone in the ED touched her because she was experiencing pain and anxiety." *Id.* at 37, ¶ 251.

After the January 11 accident, Plaintiff repeatedly complained of bilateral pain in her lower and mid-back, neck pain, and headaches, as well as left-sided weakness and pain. Between January 11, 2021 and March 13, 2021, Plaintiff's range of motion was not evaluated.

Plaintiff's chiropractor, John Ward, D.C., fitted her with a back brace, which Plaintiff was wearing on March 13, 2021. Dr. Ward determined that, as a result of her persistent pain, Plaintiff was "totally incapacitated" from January 20, 2021 to March 20, 2021, and issued her a disability certificate. *Id.* at 38, ¶¶ 260-61 (internal quotation marks omitted). Plaintiff did not work during this time period and was reimbursed under the no-

7

fault wage reimbursement insurance provision.[2]

### C.     February 2022 No-Fault Lawsuit.

In February 2022, Plaintiff filed a lawsuit in New York state court against

Sheronda Maclin and the owner of the second vehicle involved in the January 11

accident. Therein, Plaintiff claimed she had sustained a number of injuries, including:

- Neck pain;
- Aggravation of a C 4-5 posterior disc protrusion and left paracentral disc herniation[;]
- Aggravation of a C5-6 disc protrusion;
- Anterior cervical discectomy with fusion C4-5;
- Surgical scarring;
- Loss of cervical range of motion;
- Forced to undergo cervical trigger point injections;
- Back pain;
- Disc bulge L3-4;
- Disc bulge L 4-5;
- Disc bulge L5-S1;
- Loss of range of motion;
- Chest pain;
- Abdominal pain;
- Whiplash;
- Headaches;
- Posterior disc protrusion;
- Forced to undergo chiropractic treatment;
- Forced to undergo physical therapy treatment;
- Forced to undergo diagnostic testing;
- Forced to undergo pain management treatment;
- Lost wages;

---

[2] Under New York insurance requirements, no-fault lost wage reimbursement provides for reimbursement of "80% of gross earnings up to $2,000 per month for up to three years from the accident date." *Minimum Auto Insurance Requirements*, N.Y. Dep't Fin. Servs. https://www.dfs.ny.gov/consumers/auto_insurance/minimum_auto_insurance_requirements (last visited Nov. 25, 2024); *see also NOSAJ Ent. v. Tristate & Beyond, LLC*, 2024 WL 4276243, at *5 n.2 (S.D.N.Y. Sept. 24, 2024) ("The [c]ourt may properly consider the information from an official United States government website at the summary judgment stage because any facts subject to judicial notice may be properly considered in a motion for summary judgment.") (citation and internal quotation marks omitted); *id.* ("Pursuant to Federal Rule of Evidence 201(b), courts may take judicial notice of facts that are . . . readily determined from official government websites whose accuracy cannot reasonably be questioned.") (citation omitted).

• Past, present[,] and future pain and suffering.

*Id.* at 45, ¶ 307.

### D.     The March 13, 2021 Accident at Issue in this Case.

Plaintiff was involved in a motor vehicle collision with a United States Postal vehicle (the "Postal vehicle") which occurred on March 13, 2021, at approximately 4:15 p.m. in the City of Buffalo, New York (the "March 13 accident"). At the time of the accident, Ms. Calhoun was driving a Ford Explorer (the "Calhoun vehicle"), and Plaintiff was seated in its back right passenger seat with her seatbelt fastened. As Ms. Calhoun was driving down Eller Street at an estimated speed of 15 to 20 miles per hour, she saw the Postal vehicle parked on the right side of the road. When she drove past the Postal vehicle, the driver pulled into Ms. Calhoun's lane, colliding with the right passenger side of the Calhoun vehicle.

At the point of impact, Ms. Calhoun estimates she was driving between 10 to 15 miles per hour, and the Postal vehicle was driving at approximately the same speed. The left-hand mirror of the Postal vehicle and its bumper "made contact with the side of [the] Calhoun vehicle." (Doc. 32-1 at 8, ¶ 18.) The Postal vehicle sustained damage to the left side bumper and the left-hand mirror was missing after the accident. Airbags did not deploy as a result of the collision. At the time of the March 13 accident, Plaintiff was wearing a back brace from the January 11 accident.

Ms. Calhoun stated the impact between the two vehicles felt like "a thud. Like push out of the way. Like somebody shoving you." (Doc. 27-2 at 4, ¶ 22) (internal quotation marks and alteration omitted). When she observed Plaintiff after the collision, she "was moving as though she had been pushed over" and "was getting like up. Like she done fell over[.]" *Id.* at 4-5, ¶¶ 24, 25 (internal quotation marks omitted). Because of the collision, Plaintiff's body was "jerked" and "shaken." It moved towards the door of the vehicle and then in the opposite direction. *Id.* 5, ¶¶ 28, 29 (internal quotation marks omitted).

### E.     Plaintiff's Subsequent Medical Treatment.

"Plaintiff was found by ambulance personnel to be sitting upright in the backseat

9

of a vehicle in no obvious serious distress" and was able to walk. (Doc. 32-1 at 12, ¶ 37.) At that time, Plaintiff had a headache and felt a "shooting [pain] in her back and neck." (Doc. 27-2 at 5, ¶ 31) (internal quotation marks and alteration omitted). The back pain was in Plaintiff's lower back, and she complained of "numbness in her hands and her legs on both sides after the accident[.]" (Doc. 32-1 at 12, ¶ 34.) Plaintiff did not have any bruises. She rated her pain an eight out of ten. Ms. Calhoun did not sustain any injuries as a result of the accident.

"Plaintiff was able to exit the vehicle through the dented door[,]" (Doc. 27-2 at 5, ¶ 35), and was transported by ambulance from the scene of the accident to the Erie County Medical Center ("ECMC"). While being treated in the ED, she complained of head, back, and neck pain and rated her pain a ten out of ten. Plaintiff admitted she had a previous injury that caused her neck and back pain, as well as left-sided foot and hand paresthesia. After the accident, however, Plaintiff felt more midline pain through her neck and entire back, as well as paresthesia in both hands and feet. She told the ED provider she struck her head during the accident and had a frontal headache but did not lose consciousness.

When Plaintiff's paresthesia persisted, ED providers ordered an MRI of her cervical spine and referred her to the attending orthopedic doctor, Joseph M. Kowalski, M.D. Plaintiff's MRI "revealed a left paracentral disc herniation which resulted in moderate spinal stenosis[] and indented the ventral[] cervical cord, with possible mild local cord edema." *Id.* at 8, ¶ 58. Dr. Kowalski described Plaintiff's condition as follows:

> [Plaintiff] is [in] rather significant pain with weakness and numbness into her hands suggestive of a central cord injury. We discussed nonsurgical as well as surgical treatment options. The patient will require optimization by the involved medical/surgical team. Given the nature of [her] injuries I recommend anterior decompression and interbody fusion at C4/C5. Once the patient is stabilized and optimized. The risks, benefits[,] and options were discussed with the patient and the patient verbally agreed.

*Id.* at 8-9, ¶ 59. Plaintiff underwent the recommended surgery on March 16, 2021, and was discharged on March 18, 2021, with a rolling walker.

As part of her recovery, Plaintiff received home physical therapy from March 19,

10

2021 to April 1, 2021. No measurements of her cervical spine's range of motion were taken during this period due to Plaintiff's refusal. Thereafter, Plaintiff attended twenty-seven outpatient physical therapy sessions from April 15, 2021 to September 23, 2021. Plaintiff's cervical range of motion was noted during these appointments, but the record is devoid of information regarding how these measurements were taken during most of the appointments.

Plaintiff's May 11, 2021 physical therapy notes state "flexion was limited 50% with pain, extension was limited 50% with pain, rotation right and left: 65, side bending right: 35 with left sided pain, and side bending left: 35 with right sided pain." (Doc. 32-1 at 20, ¶ 71.) The July 27, 2021 physical therapy notes state "Plaintiff's active cervical range of motion was noted to be within normal limits with pain at the end range on the left with rotation and side bending to the left." *Id.* at 21, ¶ 77. Plaintiff arrived at her September 23, 2021 session requesting a discharge. She reported "an overall improvement in neck pain and stiffness and mobility[,]" *id.* at ¶ 79, and stated she felt ready to return to work and would do so soon.

As part of her recovery, Plaintiff continued to treat with Dr. Kowalski. During her April 13, 2021 follow-up appointment, Dr. Kowalski found Plaintiff was "doing well" and encouraged Plaintiff "to discontinue her cervical collar." *Id.* at 19, ¶ 67. On April 28, 2021, Dr. Kowalski noted Plaintiff continued to do well and encouraged her "to increase her activity and function." *Id.* at 20, ¶ 69. On August 25, 2021, he released Plaintiff to return to work "with no restrictions from a cervical spine standpoint." *Id.* at 21, ¶ 78. During Plaintiff's November 7, 2021 visit, she complained of pain in her neck, but Dr. Kowalski noted "she had full range of motion of her cervical spine with pain." (Doc. 32-1 at 22, ¶ 82.)

On January 13, 2022, Plaintiff resumed outpatient physical therapy. Measurements of her cervical range of motion were taken at each session, but there are no details regarding how these measurements were taken. Despite her physical therapy and other treatment, Plaintiff continued to experience neck and back pain, as well as discomfort in her extremities. On September 28, 2022, Dr. Kowalski observed Plaintiff "continued to

have neck pain and discomfort in her left shoulder and arm with activity" but that "her MRI findings were 'rather benign.'" *Id.* at 25, ¶ 94. On October 12, 2022, Plaintiff and Dr. Kowalski discussed the possibility of a second surgery to address Plaintiff's symptoms. Plaintiff underwent a second surgery on November 7, 2022, during which Dr. Kowalski removed the hardware at the C4-C5 vertebrae and performed an anterior cervical discectomy and fusion at the C3-C6 vertebrae.

After her surgery, Plaintiff attended a total of thirty-five outpatient physical therapy sessions from December 7, 2022 to July 11, 2023. During these sessions, Plaintiff's therapists measured her cervical range of motion but did not note how these measurements were taken. Although Plaintiff stated she was doing well after her surgery, she continued to complain of neck pain and paresthesia in her arms. Dr. Kowalski ordered an MRI of Plaintiff's cervical spine, which did not reveal any new abnormalities and did not suggest any further surgery was necessary.

**III.   Disputed Facts.**

The parties disagree whether the March 13 accident caused a change in Plaintiff's cervical spine such that she required surgery. Defendant, through its expert witnesses, asserts that the condition of Plaintiff's cervical spine remained unchanged as a result of the March 13 accident. It asserts, "[m]ost importantly, MRI imaging of [Plaintiff's] cervical spine **one day** before the March [13] accident and **one day** after the March [13] accident reveals no change." (Doc. 27-1 at 5) (emphasis in original). Defendant further argues that, due to Plaintiff's preexisting conditions and the January 11 accident, Plaintiff would have required surgical treatment regardless of the March 13 accident.

Plaintiff claims the March 13 accident exacerbated her preexisting conditions to the point that, after the accident, she required surgical treatment. She contends that the pre- and post-accident MRIs are different and cites Dr. Kowalski's affirmation wherein he stated:

> I do causally relate [Plaintiff's] cervical injuries, treatment[,] and complaints and the need for surgical intervention to the reported motor vehicle accident of March 1[3], 2021. . . . I have personally reviewed the cervical MRI performed on March 12, 2021 following [the January 11]

12

accident, which demonstrated a large disc herniation at C4-5 with spinal cord compression and subtle signal change within the spinal cord, as well as the cervical MRI performed on March 14, 2021, following the [March 13] accident, which demonstrated a dissection at C4-5 with moderate stenosis and signal change within the spinal cord. . . .

Based on my complete physical exams of [Plaintiff] and review of her medical history and records, it is my opinion to a reasonable degree of medical certainty that [Plaintiff] has sustained serious physical injuries[.]

(Doc. 32-3 at 3-4, ¶¶ 5, 6.)

Defendant argues that Dr. Kowalski's affirmation is insufficient to create a genuine issue of material fact because he does not opine that the March 13 accident aggravated Plaintiff's pre-existing disc herniation and degenerative disc and bone disease, nor did he "provide an objective basis, such as range of motion findings," (Doc. 35 at 11), to support his conclusion that Plaintiff's alleged limitations resulted from the March 13 accident, rather than the January 11 accident or her preexisting degenerative conditions. Defendant points out that Dr. Kowalski described the herniations shown on the March 12 and March 14 MRIs as "similar[,]" *id.* at n.13, and does not opine that there are significant differences between the March 12 and March 14 MRIs.

While under the care of VNAWNY ("VNA"), Defendant states that "no measurements of [Plaintiff's] cervical spine range of motion were noted." (Doc. 32-1 at 18, ¶ 65.) Plaintiff argues Defendant's assertion is contradicted by VNA visit notes. The referenced notes, however, do not contain range of motion measurements and do not establish a "normal" baseline for Plaintiff's cervical spine.

## IV.  Conclusions of Law and Analysis.

### A.  Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute

13

of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B.    The FTCA.

The FTCA waives the United States's sovereign immunity for claims that allege a personal injury "caused by the negligent or wrongful act or omission of any employee of

14

the Government while acting within the scope of his [or her] office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

"Under the FTCA, courts are bound to apply the law of the state . . . where the accident occurred." *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2000). Because it is undisputed that all relevant events occurred in New York, that state's substantive law applies. *See Corley v. United States*, 11 F.4th 79, 85 (2d Cir. 2021) ("The Supreme Court has consistently held that the FTCA's reference to the 'law of the place' means law of the State—the source of substantive liability under the FTCA.") (alterations adopted) (internal quotation marks omitted) (quoting *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994)).

## C.    New York's No-Fault Law.

"Under New York's 'No-Fault Law,' an individual injured in a motor vehicle accident has a limited right of recovery for pecuniary and non-pecuniary damages." *Buccilli v. United States*, 2016 WL 4940260, at *5 (W.D.N.Y. Feb. 3, 2016) (citing N.Y. Ins. Law § 5101 *et seq.*). The purpose of the law is to promptly compensate accident victims without regard to fault, to reduce the expense of tort litigation, and to alleviate the burdens on the judicial system. *Manzi v. Davey Tree Expert Co.*, 977 F. Supp. 2d 150, 156 (E.D.N.Y. 2013) (quoting *Pommells v. Perez*, 830 N.E.2d 278, 280 (N.Y. App. Div. 2005)). A plaintiff "can only recover for economic losses in excess of $50,000, or for non-economic losses provided he or she has sustained a 'serious injury[.]'" *Buccilli*, 2016 WL 4940260, at *5 (citing *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000)).

New York's No-Fault Law defines nine categories of "serious injury," four of which are relevant in this case:

[(6)] permanent loss of use of a body organ, member, function or system;
[(7)] permanent consequential limitation of use of a body organ or member;
[(8)] significant limitation of use of a body function or system; or [(9)] a
medically determined injury or impairment of a non-permanent nature

15

which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment [(the "90/180 category")].[3]

N.Y. Ins. Law § 5102(d). Whether a plaintiff has suffered a "serious injury" is a threshold question of law for the court to decide. *Yong Qin Luo v. Mikel*, 625 F.3d 772, 776-77 (2d Cir. 2010); *Licari v. Elliott*, 441 N.E.2d 1088, 1092 (N.Y. 1982).

"The defendant bears the initial burden of establishing a prima facie case that plaintiff's injuries were not serious[.]" *Ciappetta v. Snyder*, 2021 WL 536131, at \*6 (E.D.N.Y. Jan. 22, 2021) (citation, alteration, and internal quotation marks omitted). "A defendant may satisfy this burden by providing a physician's report that concludes, based upon objective evidence, that the plaintiff either has no injuries or has recovered from them." *Brusso v. Imbeault,* 699 F. Supp. 2d 567, 576 (W.D.N.Y. 2010).

If the defendant satisfies its burden, the plaintiff must "offer objective medical evidence that he or she did in fact suffer a serious injury as a result of the accident." *Buccilli*, 2016 WL 4940260, at \*6. Objective medical evidence may include "MRI and CT scan tests and reports," as well as "observations of muscle spasms during . . . physical examination of [the] plaintiff." *Sanchez v. Travelers Cos., Inc.*, 658 F. Supp. 2d 499, 507 (W.D.N.Y. 2009) (internal citations and quotation marks omitted) (alterations in original). If a plaintiff does not carry his or her burden of proof, "a court must grant summary judgment in favor of the defendant." *Buccilli*, 2016 WL 4940260, at \*6.

---

[3] The No-Fault law also allows plaintiffs to recover for "significant disfigurement[.]" N.Y. Ins. Law § 5102(d). In its memorandum in support of its motion for summary judgment, Defendant argues that "Plaintiff's surgical scar does not constitute a 'serious injury' under the 'significant disfigurement['] category of the No Fault law." (Doc. 27-1 at 27.) Plaintiff does not respond to this argument in her opposition. The court therefore deems any "significant disfigurement" claim abandoned. *See Storonsky v. Nat'l R.R. Passenger Corp.*, 2023 WL 3901693, at \*7 (W.D.N.Y. June 8, 2023) ("A party abandons a claim in the context of a summary judgment motion when [he or] she does not respond to arguments concerning that claim.") (quoting *Bryant v. Steele*, 462 F. Supp. 3d 249, 270 (E.D.N.Y. 2020) (alteration omitted)).

### 1.   Whether Defendant Satisfied Its Burden of Showing Plaintiff Did Not Sustain a "Serious Injury."

To sustain its initial burden of showing Plaintiff has not suffered a "serious injury," Defendant submits the report of Alexander Kessler, M.D., an academic neuroradiologist who reviewed Plaintiff's MRIs from November 18, 2017; December 21, 2018; December 28, 2020; January 12, 2021; March 12, 2021; and March 14, 2021. Dr. Kessler opined:

"[T]o a reasonable degree of medical certainty . . . the disc protrusion, cord compression, and cord signal changes at the C4-C5 seen on March 12, 2021, are new from the MRI of the cervical spine dated December 21, 2018. All other findings, including the C5-C6 disc protrusion, are unchanged.

(Doc. 27-8 at 45.)

Upon review of Plaintiff's March 14, 2021 MRI, Dr. Kessler noted that it showed "a disc protrusion with a small annular tear indenting the thecal sac, minimal right and mild left neural foraminal narrowing, which is unchanged from the March 12, 2021 MRI." *Id.* at 46. As a result, he concluded that "[t]he findings present on the MRI cervical spine dated March 14, 2021 are unchanged from the MRI cervical spine dated March 12, 2021." *Id.*

Based on his review of Plaintiff's imaging and medical records and history, Dr. Kessler concluded that:

[T]he condition of [P]laintiff's cervical spine did not change between March 12, 2021 and March 14, 2021. More specifically, it is my opinion, to a reasonable degree of medical certainty, that . . . the March 13, 2021 accident did not aggravate a posterior disc bulge at C3-C4, did not aggravate a C4-C5 disc protrusion, and did not aggravate a posterior disc protrusion at C5-C6. The accident did not aggravate the extent of intramedullary cord signal present at C4-C5.

*Id.*

Dr. Kessler's conclusions were confirmed by John Leddy, M.D., a professor of clinical orthopedics and rehabilitation sciences. Dr. Leddy physically examined Plaintiff and reviewed Plaintiff's diagnostic studies, medical records, and Dr. Kessler's report. Dr. Leddy concluded that:

Based upon the evidence in the medical records, my visualization of the diagnostic studies performed both before and after the [March 13] accident, and my physical examination of [Plaintiff] on [April 26, 2023], the medical evidence confirms that she at most sustained a temporary cervical muscle strain because of the March 13, 2021 accident. Her immediate post-accident cervical spine MRI is unchanged when compared with the MRI performed [one] day prior to the accident. There is no evidence of traumatic injury to the C4-5 or any other disc on the post [March 13, 2021] MRI. There is no medical evidence of traumatic aggravation of the pre-existing degenerative disc protrusion/herniation at C4-5 because of the [March 13] accident. Therefore, there is no medical evidence that the [March 13] accident caused a traumatic disc herniation at C4-5 that required cervical fusion surgery or the need for subsequent revision surgery. The large degenerative disc herniation at C4-5 existed for a long time prior to [March 13, 2021]. [Plaintiff's] pre-existing degenerative cervical disease was clearly getting objectively and progressively worse on serial MRI and CT scans performed in the years prior to and leading up to immediately before [March 13, 2021], and she was at the same time getting progressively more symptomatic from her cervical degenerative disc and bone disease prior to [March 13, 2021]. She therefore would have required cervical C4-5 fusion regardless of the [March 13] accident.

* * *

By objective medical criteria, there is no medical evidence that the [March 13] accident caused the need for traumatic revision of cervical fusion, traumatic aggravation of a pre-existing epileptic condition and headaches, traumatic aggravation of C4-5 disc herniation, the need for anterior cervical discectomy and fusion at C4-5, traumatic aggravation of cervical pain, traumatic cervical radiculopathy, traumatic C3-4, C5-6[,] and C6-7 disc bulges, or traumatic aggravation of right shoulder pain.

There is no medical evidence that she sustained a serious injury because of the [March 13] accident. There is no medical evidence that she has a permanent or significant limitation of use of her cervical spine or of her shoulder because of the [March 13] accident. There is no medical evidence that she requires current or future medical or surgical treatment with respect to the [March 13] accident.

* * *

I reach these conclusions to within a reasonable degree of medical certainty.

*Id.* at 39 (emphasis in original).

Dr. Kessler's and Dr. Leddy's reports satisfy Defendant's initial burden of proving

that Plaintiff did not sustain a "serious injury" as a result of the March 13 accident. *See Brusso*, 699 F. Supp. 2d at 577 (finding physician's report prepared after an independent medical examination of plaintiff and after reviewing plaintiff's past medical records was "sufficient to satisfy defendants' initial burden"). The burden thus shifts to Plaintiff to "offer objective medical evidence that . . . she did in fact suffer a serious injury as a result of the accident." *Buccilli*, 2016 WL 4940260, at *6.

### 2.    Whether Plaintiff Suffered Permanent Loss of Use of a Body Organ, Member, Function, or System.

Defendant argues summary judgment is appropriate because Plaintiff has failed to rebut its evidence that Plaintiff has not suffered a "serious injury" under New York's No-Fault Law. To establish a permanent loss of use of a body organ, member, function, or system under § 5102(d), "a plaintiff must show that the loss is a total loss." *Evans v. United States*, 978 F. Supp. 2d 148, 165 (E.D.N.Y. 2013) (citing *Oberly v. Bangs Ambulance Inc.*, 751 N.E.2d 457, 460 (N.Y. 2001)). "A mere limitation of use is insufficient," *Sanchez*, 658 F. Supp. 2d at 508, and "[p]ermanent injuries already in existence at the time of the car accident will not qualify as 'serious injuries.'" *Jones v. United States*, 408 F. Supp. 2d 107, 117 (E.D.N.Y. 2006) (citing *Tornatore v. Haggerty*, 307 A.D.2d 522, 523 (N.Y. App. Div. 2003) (alteration adopted)). "A claim of permanent loss of use . . . must be supported by medical records, and not based solely on plaintiff's testimony and subjective descriptions of pain." *Id.* (citing *Daviero v. Johnson*, 441 N.Y.S.2d 895, 898 (N.Y. Sup. Ct. 1981)).

Plaintiff claims that she has suffered "a total loss of the natural disc, cartilaginous endplates, and longitudinal ligament at C4-C5 along with the total loss of use of the entire C4-C5 joint as a result of the March 16, 2021, fusion surgery" caused by the March 13 accident. (Doc. 32 at 15.) She asserts her preexisting injury was extended to include the C3-C4-C5-C6 levels after her second surgery. In so arguing, she relies on Dr. Kowalski's

19

report that Plaintiff "has sustained a significant, permanent injury to [her] cervical spine."
[4] (Doc. 32-3 at 4, ¶ 6.)

In their expert reports, Dr. Leddy and Dr. Kessler found that Plaintiff had
preexisting cervical and spinal damage prior to Dr. Kowalski's report and unrelated to the
March 13 accident. Dr. Leddy opined that:

> [T]he large degenerative disc herniation at C4-5 existed for a long time
> prior to March 13, 2021. Her pre-existing degenerative cervical disease was
> clearly getting objectively and progressively worse on serial MRI and CT
> scans performed in the years prior to and leading up to immediately before
> March 13, 2021, and she was at the same time getting progressively more
> symptomatic from her cervical degenerative disc and bone disease prior to
> March 13, 2021. She therefore would have required cervical C4-5 fusion
> regardless of the March 13, 2021 accident.

(Doc. 27-1 at 19) (alterations adopted). Dr. Kessler found that "[t]he findings present on
the MRI cervical spine dated March 14, 2021 are unchanged from the MRI cervical spine
dated March 12, 2021." (Doc. 27-8 at 46.)

Dr. Kowalski's report does not rebut these conclusions. Plaintiff has thus failed to
establish she suffered a "serious injury" as a result of the March 13 accident. *See Tatar v.
Gray Meadows Trucking, Inc.*, 2011 WL 6153175, at \*2 (N.D.N.Y. Dec. 12, 2011)
("[R]emoval of a disc does not constitute a serious injury.") (citing *Schou v. Whiteley*,
780 N.Y.S.2d 659, 663 (N.Y. App. Div. 2004)); *Madden v. Lee*, 2002 WL 31398951, at
\*5 (S.D.N.Y Oct. 25, 2002) (finding "limitation in the range of motion in [plaintiff's]
neck" did not constitute a "permanent loss of use of a body organ or member[]").

### 3. Whether Plaintiff Suffered Permanent Consequential Limitation of Use of a Body Organ or Member or a Significant Limitation of Use of a Body Function or System.

Plaintiff alternatively argues that her spinal fusion surgeries have resulted in
significant, if not permanent consequential, limitations to the use of her cervical spine

---

[4] Dr. Kowalski, however, acknowledges that Plaintiff is still able to perform movements with her
cervical spine, albeit with limits and pain. *See* Doc. 32-3 at 4, ¶ 8 ("[Plaintiff] still has
significant, permanent limits in sitting, pushing, pulling, carrying, lifting[,] and other normal
body range of motion and strength activities utilizing the cervical spine[.]").

and her extremities. "Whether a limitation of use or function is 'significant' or 'consequential' (*i.e.*, important) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose[,] and use of the body part." *Manzi*, 977 F. Supp. 2d at 156-57 (emphasis in original) (alteration omitted).

"[T]o show a 'permanent consequential limitation of use of a body organ or member,' [a] plaintiff must present evidence that [he or] she has suffered a permanent limitation that, though not total, is of sufficient severity to be deemed consequential in comparison to [his or] her prior non-injured condition." *Ruffin v. Rana*, 2013 WL 4834368, at *12 (S.D.N.Y. Sept. 4, 2013) (citing *Toure v. Avis Rent a Car Sys.*, 774 N.E.2d 1197, 1201 (N.Y. 2002)). "A plaintiff must also 'produce competent medical evidence that his [or her] injuries are permanent.'" *Satterfield v. Maldonado*, 127 F. Supp. 3d 177, 191 (S.D.N.Y. 2015) (alterations adopted) (quoting *Ventra*, 121 F. Supp. 2d at 333).

"Proof of a herniated disc, without additional objective medical evidence establishing that the accident resulted in significant physical limitations, is not alone sufficient to establish a serious injury." *Pommells*, 830 N.E.2d at 282. In such cases, a plaintiff may supplement his or her claim with "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion[,]" or "[a]n expert's qualitative assessment of a plaintiff's condition . . . , provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose, and use of the affected body organ, member, function, or system." *Yong Qin Luo*, 625 F.3d at 777. Plaintiff's proffered evidence must be admissible. "Uncertified medical records and unsworn letters or reports are of no probative value." *Evans*, 978 F. Supp. 2d at 168 (quoting *Parmisani v. Grasso*, 218 A.D.2d 870, 872 (N.Y. App. Div. 1995)).

Plaintiff relies in part on Dr. Kowalski's sworn report stating Plaintiff "still has significant, permanent limits in sitting, pushing, pulling, carrying, lifting[,] and other normal body range of motion and strength activities utilizing the cervical spine[.]" (Doc. 32-3 at 4, ¶ 8.) To be admissible at summary judgment, such a report "must be based

21

upon a recent examination of the injured plaintiff or an adequate explanation must be offered in the absence of a recent examination." *Evans*, 978 F. Supp. 2d at 169. Dr. Kowalski's report, issued on March 20, 2024, states his opinion is based on "complete physical exams of [Plaintiff] and review of her medical history and records[.]" (Doc. 32-3 at 4, ¶ 6.) There is, however, no indication Dr. Kowalski physically examined Plaintiff after her November 2022 surgery. Because there is a sixteen-month gap between the report and Dr. Kowalski's examination of Plaintiff, it does not alone create a triable issue of fact. *See Evans*, 978 F. Supp. 2d at 169 ("In a case involving soft tissue injuries, [a twenty-month gap] between the last examination and a physician's affidavit is generally insufficient to raise a triable issue as to whether the plaintiff suffered a serious injury.").

Plaintiff further relies on unsworn physical therapy records which reveal her cervical range of motion after the March 13 accident. Days after her first surgery, Plaintiff was unable to perform cervical active range of motion, and flexion, rotation, and bending were limited with pain. Later physical therapy examinations indicated flexion, rotation, and bending continued to be limited with end-range pain. Plaintiff cites Dr. Leddy's sworn report, wherein he noted that, during his examination, Plaintiff's range of motion was limited in all directions.[5] Dr. Leddy's report, however, does not establish how long Plaintiff's limitations have existed and does not provide a method of comparing those limitations to Plaintiff's pre-March 13 accident range of motion.

Regarding a significant limitation of use of a body function or system, "the law requires the limitation be more than minor, mild[,] or slight and the claim must be supported by medical proof based upon credible medical evidence of an objectively measured and quantified medical injury or condition." *Evans*, 978 F. Supp. 2d at 165-66 (internal quotation marks and alteration omitted) (quoting *Oved v. Salotti*, 2000 WL 1099926, at *1 (S.D.N.Y. Aug. 7, 2000)). A significant limitation may be proven by medical evidence "detailing either a numeric percentage of a plaintiff's loss in range of

---

[5] Dr. Leddy's report stated: "[Plaintiff's a]ctive cervical extension is 20° (normal 60°); flexion is 20° (full is at 50°); right rotation is 50[°] and left rotation is 40° (normal rotation is 80°), all accompanied by a sensation of tightness and discomfort." (Doc. 27-8 at 33.)

motion, or a qualitative assessment of his [or her] condition that is based on objective
medical information, and compared to 'normal' use." *Id.* at 166 (alteration adopted)
(internal quotation marks omitted) (quoting *Alvarez v. E. Penn Mfg. Co.*, 2012 WL
4094828, at *5 (S.D.N.Y. Sept. 17, 2012)).

Although Dr. Leddy's sworn report establishes Plaintiff has decreased mobility of
her cervical spine, "evidence of a limitation at a single exam" does "not satisfy the
duration component necessary to establish significance[.]" *Pfeiffer v. Mavretic*, 2007 WL
2891433, at *8 (W.D.N.Y. Sept. 28, 2007). Because Plaintiff does not offer admissible
evidence establishing the difference between her post-March 13 accident range of motion
and her pre-accident "normal use," she has failed to establish that, as a result of the
March 13 accident, she has suffered a permanent consequential limitation of use of a
body organ or member or a significant limitation of use of a body function or system.

### 4.    Whether Plaintiff Suffered a Serious Injury Under the 90/180 Category.

Plaintiff contends that her inability to return to work promptly after her surgery,
her use of a walker, and her need for increased homecare assistance all rebut Defendant's
showing that she has not sustained a serious injury under the 90/180 category. To
establish a serious injury under the 90/180 category, a plaintiff must "prove that [he or]
she was curtailed from performing [his or her] usual activities to a great extent rather than
some slight curtailment." *Buccilli*, 2016 WL 4940260, at *10 (internal quotation marks
omitted) (citing *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 924-25 (S.D.N.Y. 2003)). A
plaintiff's claims must be supported by objective medical proof, rather than a plaintiff's
statements of pain or limitation. *Hyacinthe v. United States*, 2009 WL 4016518, at *12
(E.D.N.Y. Nov. 19, 2009). "[A] plaintiff's deposition testimony alone is insufficient to
defeat a motion for summary judgment." *Brusso*, 699 F. Supp. 2d at 583.

Plaintiff argues that she has suffered a serious injury because she was not released
to return to work until August 15, 2021, 165 days after the March 13 accident, and she
did not return to work until October 7, 2021, 208 days after the March 13 accident.
Plaintiff, however, was totally incapacitated from January 20, 2021, through March 20,

23

2021, and was not working on March 13, 2021. She also provides no medical explanation for why she did not return to work until nearly two months after she was medically released to do so.

Although Plaintiff asserts that her ambulation was assisted by a walker upon discharge from her first surgery, she had previously used a walker to ambulate as a result of her seizure disorder. Similarly, although Plaintiff required increased homecare assistance after the March 13 accident, she received sixteen hours per week of assistance well before that time. Prior to the January 11 accident, Ms. Calhoun was paid to assist Plaintiff with activities such as cleaning, mopping, doing laundry, and cooking meals. Ms. Calhoun also ran errands and provided Plaintiff with transportation. Ms. Calhoun continued to perform these activities after the March 13 accident. Before either of the car accidents, Plaintiff spent most of her time at home, and this did not change after March 13, 2021. Against this backdrop, Plaintiff has failed to rebut Defendant's evidence that she did not suffer an injury under the 90/180 category. *Brusso*, 699 F. Supp. 2d at 583 (finding plaintiff's "own deposition testimony describing that she no longer engages in certain household chores, such as vacuuming and laundry, and no longer enjoys bicycling or camping without pain . . . [is] insufficient to establish a prima facie case of serious injury under the 90/180 category[]").

Because Plaintiff has failed to establish she suffered a "serious injury" as a result of the March 13 accident under the 90/180 category, the court GRANTS Defendant's motion for summary judgment on Plaintiff's claim for non-pecuniary damages.

### D. Whether New York's No-Fault Law Bars Plaintiff from Recovering Pecuniary Damages.

New York's No-Fault Law allows a plaintiff to recover in tort for "basic economic loss" in excess of $50,000. N.Y. Ins. Law § 5102(a). "'Basic economic loss' includes medical expenses, lost wages, and other reasonable and necessary expenses." *Ventra*, 121 F. Supp. 2d at 332.

Plaintiff claims lost earnings stemming from the March 13 accident in the amount of $25,000, for which she was reimbursed at the No-Fault 80% rate. Plaintiff does not

claim any other qualifying economic losses. She did not maintain a record of her out-of-pocket expenses.

Because Plaintiff has not demonstrated she sustained a "basic economic loss," Defendant's motion for summary judgment on Plaintiff's claims for pecuniary damages is GRANTED. *See Ott v. Gonzalez*, 2022 WL 17957297, at \*15 (W.D.N.Y. Dec. 27, 2022) (granting summary judgment where "[p]laintiff has acknowledged that her healthcare costs [totaling $4,059.04] were covered in full by her insurance provider. She disclaims lost wages or earnings. There is thus no evidence that she suffered a 'basic economic loss' in excess of the statutory threshold[]").

### E.    Whether Defendant Caused Plaintiff's Injuries.

Even in the absence of New York's No-Fault Law's requirement of a "serious injury," Defendant argues summary judgment remains appropriate because Plaintiff has not established that the March 13 accident caused her injuries. "[T]he issue of causation is separate and distinct from the issue of whether [a plaintiff] suffered 'serious injury' as a matter of law[.]" *Heisler v. MPT N.Y., Inc.*, 2003 WL 23350126, at \*4 (W.D.N.Y. Dec. 22, 2003). As a result, "[b]efore the [c]ourt determines whether [a p]laintiff has demonstrated that he [or she] suffered a serious injury as a result of the accident, the [c]ourt must decide whether there is a causal connection between [p]laintiff's injuries, serious or not, and the accident." *Tatar*, 2011 WL 6153175, at \*3. In cases where "a defendant's proof that the plaintiff has not sustained a serious injury as a result of the motor vehicle accident at issue rests in part on evidence that [he or] she had a preexisting medical condition prior to the accident, the plaintiff must address that contention in [his or] her medical reports." *Brusso*, 699 F. Supp. 2d at 584 (footnote omitted) (citing *Rhone v. United States*, 2007 WL 3340836, at \*6 (S.D.N.Y. 2007)).

Defendant argues that before the March 13 accident, Plaintiff had an extensive list of preexisting conditions which included epilepsy, sarcoidosis, meningitis, fibromyalgia, mononeuropathy of both extremities, and chronic pain. At the time, she managed these conditions with various medications including Norco/Lortab, which are combination medications containing an opioid to control moderate to severe pain. Years before the

March 13 accident, Plaintiff complained of pain in her neck and back as well as of bilateral pain and numbness in her extremities. Plaintiff's MRIs reveal degenerative disc disease and a disc bulge prompting discussion of surgery as a treatment option prior to the March 13 accident. Plaintiff's MRI after the January 11 accident revealed a disc protrusion at the C4-5 level.

Plaintiff reported ongoing back and neck stiffness and pain as a result of the January 11 accident. As a result, Plaintiff was fitted with a back brace and was deemed totally incapacitated from January 20, 2021 to March 20, 2021. Defendant contends this evidence demonstrates that before March 13, 2021, Plaintiff already suffered from the injuries and conditions she claims were caused by the March 13 accident.

In response, Plaintiff offers Dr. Kowalski's report, wherein he notes that the "cervical MRI performed on March 12, 2021 . . . demonstrated a large disc herniation at C4-5 with spinal cord compression and subtle signal change within the spinal cord," and the "cervical MRI performed on March 14, 2021 . . . demonstrated a dissection at C4-5 with moderate stenosis and signal change within the spinal cord." (Doc. 32-3 at 4, ¶ 5.) He further opines "a permanent weakening of [Plaintiff's] cervical spine has occurred, and she will be subjected to frequent and ongoing exacerbations of her symptom complex for the remainder of her life." *Id.* at 5, ¶ 9.

Dr. Kowalski's report, however, does not address Dr. Leddy's opinion that "[t]he large degenerative disc herniation at C4-5 existed for a long time prior to" the March 13 accident and that "[Plaintiff's] pre-existing degenerative cervical disease was clearly getting objectively and progressively worse on serial MRI and CT scans performed in the years prior to and leading up to immediately before [March 13, 2021]," meaning she "would have required cervical C4-5 fusion regardless of the [March 13] accident." (Doc. 27-8 at 39); *see Pommells*, 830 N.E.2d at 388-89 ("While plaintiff provided [an] expert report of specific losses of range of motion in plaintiff's spine, opining that plaintiff suffered serious and permanent injuries which were causally related to the accident, plaintiff did not refute defendant's evidence of a preexisting degenerative condition. . . . In the absence of any such evidence, . . . defendant was entitled to summary dismissal of

26

the complaint[.]") (internal citations omitted); *see also Arenes v. Mercedes Benz Credit Corp.*, 2006 WL 1517756, at *9 (E.D.N.Y. June 1, 2006) (finding plaintiffs' expert report insufficient to raise triable issue of fact because the conclusory opinion failed to address plaintiffs' preexisting degenerative conditions). Dr. Kowalski also does not address Dr. Leddy's contention that Plaintiff's muscle strain after the March 13 accident was at most "temporary." (Doc. 27-8 at 39).

Relying on Dr. Leddy's report, Plaintiff has established her range of motion is currently limited. She does not, however, present any objective medical evidence that her range of motion was diminished from her range of motion prior to the March 13 accident. During a 2017 consultation, Ashraf Henry, M.D., noted that Plaintiff's "range of motion of her neck was normal in all directions, but painful, and she had reduced range of motion of her low back with pain during flexion." (Doc. 27-2 at 24, ¶ 162.) A 2018 consultation similarly revealed Plaintiff's "range of motion of her neck and low back was described as normal, but painful." *Id.* at 27-28, ¶ 181. Plaintiff, however, cites no evidence of her range of motion between the January 11 accident and the March 13 accident. Without this benchmark, a comparison cannot be made. *See Brusso*, 699 F. Supp. 2d at 585 (observing that "the plaintiff must come forward with at least enough evidence from which a rational jury could conclude that the accident, and not the preexisting condition, was the cause of her claimed injuries[]") (citing *Pommells*, 830 N.E.2d at 388-89).

Accordingly, in addition to failing to demonstrate a "serious injury," Plaintiff has failed to establish her injuries were caused by the March 13 accident. Defendant's motion for summary judgment for lack of causation is therefore GRANTED. *See id.* at 585 (granting summary judgment where "th[e] record [was] devoid of any evidence rebutting defendants' proof that [plaintiff] suffered from a preexisting condition giving rise to the same type of injuries that [plaintiff] attributes to the accident[]").

## CONCLUSION

For the reasons stated above, the court GRANTS Defendant's motion for summary judgment. (Doc. 27.)

SO ORDERED.

Dated this __12__ day of January, 2025.

Christina Reiss, District Judge
United States District Court